NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

FRANK SIMONETTI,                     :
                                     :        **Civil Action No. 10-3903 (SRC)**
                        Plaintiff,   :
                                     :              **OPINION**
            v.                       :
                                     :
BROADRIDGE FINANCIAL                 :
SOLUTIONS, INC. and BRUCE PEYSER,    :
                                     :
                       Defendants.   :
                                     :

**CHESLER**, District Judge

This matter comes before the Court upon Defendants' motion for summary judgment [docket entry 41]. Plaintiff has opposed the motion. The Court has considered the papers submitted by the parties. For the reasons expressed below, the Court will deny Defendants' motion.


I.   **BACKGROUND**

This action arises out of the October 5, 2009 termination of Plaintiff's employment with Defendant Broadridge Financial Services, Inc. ("Broadridge"), immediately following Plaintiff's approved leave from his job for recuperation from a back injury. The Court will provide some relevant background concerning Plaintiff's employment at Broadridge and his physical ailments.

Plaintiff Frank Simonetti was hired in 1990 by ADP Brokerage Services Group, the predecessor to Defendant Broadridge, a global provider of technology-based services to clients in

the financial services industry. Simonetti began his employment in an entry-level position. Over the years, he received various promotions, ultimately attaining the position of Senior Director, Account Management. His responsibilities in this position included managing relationships with Broadridge's clients, serving as the initial point of communication for those clients and bringing in sales revenue. Along with these promotions, Simonetti also received merit-based salary increases and bonuses.

Defendants highlight that Simonetti's employment history with Broadridge also includes performance deficiencies, which they contend began in 1992. In particular, they point to a 90-day Performance Improvement Plan on which Simonetti was placed in 1992 (the "1992 PIP"). Though not expressly stated by Defendants, it appears from the record before the Court that Simonetti successfully completed his 1992 PIP, as the PIP states that failure to complete its objectives would result in the termination of his employment. Plaintiff, of course, remained employed at Broadridge for many years following the 1992 PIP. It appears that until approximately 2007, he received no further negative assessments, as Defendants have not presented any evidence of Broadridge's dissatisfaction with Simonetti's performance between 1992 and 2007.

Simonetti received a critical performance review for 2007. The annual appraisal listed several problems including weakness in the area of administration (requiring improvement in "written documentation, clear concise communication and collaboration"); a "poor work ethic;" lack of leadership qualities, hindering chances of further promotion; the perception among his associates that he was "not responsive;" and inability to multitask. (Galusha Cert. Ex. F.) The 2007 review was prepared by Defendant Bruce Peyser, Plaintiff's direct supervisor. The parties

2

dispute the date on which Simonetti formally began reporting to Peyser, but it is clear that at least as early as 2007 until the time of Plaintiff's termination, Peyser was responsible for preparing his performance reviews.

Simonetti again received a poor review for 2008. In the 2008 annual appraisal, completed on February 7, 2009, Peyser rated his job performance as "Unsatisfactory," the lowest rating category. He noted that Simonetti is a "strong performer" on the "sales responsibilities of adding value added sales" but faltered in other aspects of the account manager position, particularly in his poor communication with clients, failure to respond to clients' needs or requests promptly, and deficiencies concerning collaboration with colleagues. (Galusha Cert., Ex. I.) Moreover, the appraisal expressly advised that "if there is not significant and immediate improvement termination could result." (Id.) The review referenced two conversations Peyser had with Simonetti about his performance deficiencies, one on December 8, 2008 and another on February 2, 2009, which the Court will discuss further below.

At about the same time Simonetti was given the "unsatisfactory" 2008 review, Simonetti was placed on a Performance Improvement Plan (the 2009 PIP). The 2009 PIP is memorialized in a memorandum from Peyser to Simonetti, dated February 3, 2009. It addressed Simonetti's performance deficiencies, as well as his "chronic absenteeism." (Galusha Cert., Ex. J.) The 2009 PIP stated, in relevant part:

> It has become highly visible over the past weeks that you are not managing your client workload and responding externally to clients with progressive status updates nor providing updates to Broadridge associates on a timely basis. Your March 2008 performance review accurately depicted your performance and what needed improvement. You and I had a very serious discussion on Dec 8, 2008 when I told you, your performance and followup [sic] were not good and you needed to communicate clearly and

3

concisely both internally and externally and be on top of and accountable
for all client issues.  We have had these discussions periodically over the
past few years. Once we spoke you would put on a burst of activity to get
caught up but this has not been maintained.

* * *

**Another issue that needs to be address** [sic] **is your attendance.  You
have been out in the month January 10 sick days.  This is
unacceptable**[.]
While I understand you were out with some different issues, each instance
causes more work for those of us who are here . . .
You need to be at work.  If you have medical issues then a leave is what
should be looked at and discussed with HR.  Going forward if you are out
ill it is expected that you will contact me by either speaking with me or
leaving me a message and you will need to provide a doctor's note.

(Id. (emphasis in original).)  The 2009 PIP provided that Simonetti would be reviewed on a

weekly basis until April 2, 2009 for improvement in job performance and attendance and also

warned that failure to meet expectations could result in Simonetti's termination.  Progress notes

made by Peyser while Simonetti was on the 2009 PIP noted improvements.  The final notation,

made on March 27, 2009, stated "Frank continues to perform in the manner required of Account

Managers" but also that "slippage to previous performance/behaviors will not be acceptable and

are subject to the same ramifications as failures in the PIP[.]" (Carabba Cert. Ex. FF.)

Simonetti's employment continued at Broadridge generally without incident, with the exception

of one request made by a Broadridge client as set forth below.

    It appears that Simonetti's absences became an issue of Broadridge's attention in 2007,

and it further appears that Peyser and Broadridge's HR department were aware of the medical

problems to which Simonetti's absences were attributable.  An email dated June 4, 2007, sent by

Peyser to Simonetti, and copied to a member of the HR department, states as follows:

4

> Frank:
>
> I want to recap what we discussed about absences today (6/4/07).
> ADP's HR policy is a maximum of 5 sick days per 6 months.  At this date
> (6/4/07) you have 6 sick days which is unacceptable.
> We are having this discussion so you understand the importance of being
> at work.  While I understand you were out with some different issues, each
> instance causes more work for those of us who are here . . .
>
> You need to be at work.  If you have medical issues then disability is what
> should be looked at and discussed with HR.
>
> Please be advised that if continued absences occur, you will be placed on a
> PIP, and then, if another absence occurs termination may/will result[.]

(Galusha Cert., Ex. D.)

Though the "medical issues" Peyser raised are not explicitly identified in the June 4, 2007 email, the record contains abundant evidence to draw the plausible inference that Peyser was referring to Plaintiff's ongoing and serious back problems.  The record shows that Plaintiff sustained a back injury in 1996, when he slipped and fell, herniating the L4 and L5 discs in his lower back.  According to Simonetti, this injury has caused him to suffer chronic back pain. When the injury is aggravated, or in Simonetti's words when his back "goes out," he experiences debilitating pain that prevents him from driving, walking or even sitting.  (Simonetti Cert. ¶ 9.) Simonetti states that his back pain caused him to take various absences from work, specifically those of 2007, February 2008, December 2008 and the medical leave he took in August 2009 immediately prior to his termination.  (Id. ¶ 10.)  He further states that he informed Peyser of his condition and told him he was under a doctor's care.  (Id.)  Peyser's deposition testimony reflects

that, at least as early as the mid to late 1990s, when Peyser briefly managed the group to which

Simonetti was then assigned, Peyser was aware that "Frank [Simonetti] had a bad back."  (Peyser

Dep. at 85:24.)

Then, on December 8, 2008, Peyser and Simonetti had what the 2009 PIP described as a

"very serious discussion" about Simonetti's job performance and poor attendance.  (Galusha

Cert., Ex. J.)  In preparation for the discussion, Peyser reviewed Simonetti's 2008 attendance

record and counted 13 sick days, in addition to other non-illness related absences.  Simonetti

testified that the discussion took place upon his return to work after a week-long absence due to

his back problems.  He further testified that he did not take medical leave because he was not

aware that medical leave was available for an absence that lasted only days.  According to

Simonetti, in the December 8, 2008 conversation, Peyser stressed that Simonetti had to be at

work and could not be out sick.  According to Peyser, he informed Simonetti that his poor

attendance caused work to accumulate and that if such performance continued, his job would be

in jeopardy.

Shortly thereafter, Simonetti was again out of work for a period of 10 days in January

2009.  According to Simonetti, he was suffering from massive headaches and extremely high

blood pressure at the time.  Peyser testified that he was aware of Simonetti's serious medical

condition and knew that his January 2009 absence was due to his high blood pressure.  This

absence is expressly referenced in the 2009 PIP.  Simonetti testified at his deposition that he

complained to HR that he was placed on the 2009 PIP in retaliation for his absences and

emphasized to HR that both the December 2008 and January 2009 absences were for serious

illnesses.

The final period of absence prior to Simonetti's termination began in August 2009.  The absence was prompted by re-injury to Simonetti's lower back when he bent down to pick up a computer at home.  An MRI of his lumbar spine performed later that month confirmed disc bulge and herniation and the L4-L5 level and also at the L5-S1 level. (Carabba Cert. Ex. T.)  He was diagnosed with "multilevel degenerative disc disease."  (Id.) Simonetti made his employer aware of his injury and submitted the paperwork for approval of a medical leave of absence.  His medical and disability leave were approved to run from August 10, 2009 through October 4, 2009.

On October 5, 2009, Simonetti returned to work.  On that day, he was fired.  According to Simonetti, Peyser explained at the termination meeting that he was fired because a client had complained about Simonetti.  On September 24, 2009, during Simonetti's medical leave, Mark Felten of Edward Jones, a major client of Broadridge, asked that Simonetti be taken off the Edward Jones account and replaced with the account manager who had been filling in for Simonetti because that manager was doing a far better job than Simonetti. (Carabba Cert., Ex. HH.)  Defendants characterize Felten's request as a client complaint, but Felten testified that he did not feel that Simonetti was doing a bad job, simply that the substitute account manager was doing a far better one.  (Felten Dep. at 91:15-17.)  Peyser testified that in approximately late August or early September 2009, he decided to terminate Simonetti for his failure to comply with the requirements of the 2009 PIP and for his overall history of performance deficiencies. (Statement of Material Facts ¶ 54; Peyser Dep. at 239:14-241:25.)

This lawsuit was initiated on August 2, 2010.  The Complaint asserts three claims for relief: interference with rights under the Family Medical Leave Act ("FMLA"), retaliation against

Plaintiff for exercising his rights under the FMLA and discrimination against Plaintiff on the basis of disability in violation of the New Jersey Law Against Discrimination ("NJLAD"). Defendants have moved for summary judgment on the entire Complaint. The Court will review each claim in turn below to determine whether it may withstand Defendants' motion and proceed to trial.

## II.   DISCUSSION

### A.   Standard of Review

The standard upon which a court must evaluate a summary judgment motion is well-established. Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. See Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than

simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec. Indus.

Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The party opposing the motion for

summary judgment cannot rest on mere allegations and instead must present actual evidence that

creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248; see also

Fed.R.Civ.P. 56(c) (setting forth types of evidence on which nonmoving party must rely to

support its assertion that genuine issues of material fact exist).  "[U]nsupported allegations . . .

and pleadings are insufficient to repel summary judgment."  Schoch v. First Fid. Bancorporation,

912 F.2d 654, 657 (3d Cir. 1990).  "A nonmoving party has created a genuine issue of material

fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."  Gleason v.

Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).  If the nonmoving party has failed "to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue

of material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  Katz v. Aetna Cas. &

Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).

**B.     FMLA Interference Claim**

The FMLA assures that eligible employees may take reasonable leave, up to 12 weeks in

a year, for, among other reasons, the employee's own medical condition, without suffering the

consequence of losing his or her job.  29 U.S.C. § 2612(a)(1); Conoshenti v. Public Svc. Elec. &

Gas. Co., 364 F.3d 135, 141 (3d Cir. 2004).  To promote enforcement of its protections and

entitlements, the FMLA created a private right of action that may be brought by an employee to

seek damages and equitable relief for a violation of his or her FMLA rights.  29 U.S.C. §

2617(a).  The statute expressly prohibits an employer from interfering with, restraining or

denying an employee's entitlements thereunder.  29 U.S.C. § 2615(a).

To establish his claim under the FMLA, Simonetti must show "(1) [he] is an eligible

employee under the FMLA, (2) defendant is an employer subject to the requirements of the

FMLA, (3) [he] was entitled to leave under the FMLA, (4) [he] gave notice to the defendant of

[his] intention to take FMLA leave, and (5) the defendant denied [him] the benefits to which [he]

was entitled under the FMLA."  Parker v. Hahnemann Univ. Hosp., 234 F. Supp. 2d 478, 484

(D.N.J. 2002).  There appears to be no dispute regarding the first four elements.  Defendants,

rather, argue that they are entitled to summary judgment on Plaintiff's FMLA interference claim

because the uncontroverted evidence demonstrates that Broadridge approved Simonetti's request

for FMLA leave in August 2009 and did nothing to discourage him or prevent him from taking

the medical leave to which he was entitled.  Pointing to a snippet of deposition testimony in

which Plaintiff acknowledged that no one at Broadridge "stood in [his] way" when he sought

leave in August 2009 (Simonetti Dep. at 232:7-9), Defendants maintain that Plaintiff concedes

that his FMLA interference claim is baseless.

Defendants' argument, however, raises completely inapposite facts and reflects a

misunderstanding, or perhaps even a mischaracterization, of Simonetti's claim.  In this case,

Plaintiff's entitlement-based FMLA claim rests on the theory that Broadridge interfered with his

right to FMLA leave, in violation of 29 U.S.C. § 2615(a), by refusing to reinstate him to his job

upon the expiration of his approved FMLA leave.  The statute requires an employer to reinstate

an employee to his same position or to an equivalent position upon his return from a qualified

absence.  29 U.S.C. § 2614(a)(1); Conoshenti, 364 F.3d at 141.  An employer who fails to

10

comply with this obligation will be liable for interfering with the employee's FMLA rights unless it can show that the employee would have been terminated during the leave period even if the employee had been working. 29 C.F.R. § 825.216(a); Conoshenti, 354 F.3d at 141.  Thus, to prevail on an FMLA interference claim involving this qualified entitlement to reinstatement, the Plaintiff must initially meet his very straightforward burden of demonstrating that he was entitled to benefits under the FMLA and was denied reinstatement following leave.  Parker, 234 F. Supp. 2d at 485, 487.  The burden then shifts to the employer defendant to prove that plaintiff would have lost his job even if he had not taken FMLA leave.  Id. at 487.

Simonetti has clearly proffered sufficient evidence upon which a jury could conclude that he was entitled to reinstatement but denied it following an FMLA leave of absence.  There is no dispute that his approved leave for his back condition expired on October 4, 2009 and that he was terminated on October 5, 2009.  The Court, then, must turn to review what evidence Defendants adduce to demonstrate that Simonetti would have been terminated, regardless of the leave which commenced in August 2009.  They point to his poor annual reviews for 2007 and 2008, his 2009 PIP and complaints about his performance, particularly from Broadridge client Edward Jones and from Peyser, who repeatedly warned Plaintiff that continued performance deficiencies and absences would result in disciplinary action including termination.  This evidence, the Court concludes, does not carry Defendants' burden as a matter of law.  The proof of Broadridge's non-leave related termination of Simonetti essentially centers on the 2009 PIP, which appears to have been precipitated by the deteriorating performance review for 2008 and the absences, perceived as excessive, of December 2008 and January 2009.  Though Defendants rely on the deficiencies identified in the 2009 PIP, it is clear that the 2009 PIP had by its terms concluded months before

11

Simonetti began his leave, with a favorable progress note by Peyser that Simonetti was meeting the goals of an Account Manager.  Drawing all inferences in favor of the non-movant, the Court finds that a reasonable jury could determine that Simonetti had cured his performance deficiencies and continued to perform to his employer's satisfaction.

To the extent Broadridge's and/or Peyser's dissatisfaction with Simonetti's performance was related to his absences, a trier of fact could conclude that in receiving some or all his negative reviews, Simonetti was essentially penalized for taking FMLA-protected time off from work.  There is evidence that Defendants were on notice and aware that Plaintiff's absences were due to medical conditions, yet Peyser complained that Simonetti had to be at work because his tasks were "bubbling up" during the absences. (Peyser Dep. at 155.)  Defendants seem to regard these absences as legitimate reasons on which to base their negative assessment of Plaintiff's performance, relying on the fact that Plaintiff did not apply for FMLA leave for those periods in 2007, 2008 and early 2009.   Their approach to defending their termination turns the FMLA on its head.  "An employer's duty to afford an employee the protections of the FMLA begins as soon as 'the employee provides the employer with enough information to put the employer on notice that FMLA-qualified leave is needed.'" Marrero v. Camden County Bd., 164 F. Supp. 2d 455, 464 n.6 (D.N.J. 2001) (quoting Stoops v. One Call Commc'ns, 141 F.3d 309, 312 (7th Cir.1998)).  FMLA regulations provide that the employee need not expressly invoke his statutory rights; rather, once on notice, the burden is on the employer to request and obtain information needed to determine whether the employee has a "serious medical condition" qualifying him for leave.  29 C.F.R. § 825.303(b).  The Court wishes to make clear that it is not reaching the issue of whether Simonetti's various absences, noted as a problem in his 2009 PIP, were indeed

FMLA-qualified and should have been treated as such by Broadridge. It makes this observation simply to point out that Defendants have not demonstrated that there is no triable issue of fact regarding the basis for Simonetti's termination.  Faced with an FMLA interference claim, a defendant may not establish the affirmative defense of a justified termination based on excessive absenteeism where those absences are, or should have been, protected under the FMLA. Marrero, 164 F. Supp. 2d at 466 (citing Viereck v. City of Gloucester City, 961 F.Supp. 703, 708 (D.N.J.1997)).

In light of sufficient evidence in the record to permit Plaintiff to establish a prima facie FMLA claim for failure to reinstate him to his job, and the various questions of fact which prevent Defendants from establishing their affirmative defense as a matter of law, the Court will deny Defendants' motion for summary judgment as to the claim for interfering with and/or depriving Plaintiff of his FMLA rights, in violation of 29 U.S.C. §§ 2614(a) & 2615(a).

## C.    FMLA Retaliation Claim

Plaintiff also asserts an FMLA claim, for violation of 29 U.S.C. 2615(a)(2), under a retaliation theory of recovery.  In relevant part, the FMLA makes it unlawful for an employer to fire or otherwise discriminate against an employee for using FMLA leave.  29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c); Parker, 234 F. Supp. 2d at 487-88.  Our courts apply the three-step McDonnell Douglas burden shifting framework, used in various other employment discrimination contexts, to FMLA retaliation claims.  Parker, 234 F. Supp. 2d at 488 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973)).  The Supreme Court has summarized the framework as follows:

13

> The Court in *McDonnell Douglas* set forth a burden-shifting scheme for discriminatory-treatment cases. Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual.

Raytheon Co. v. Hernandez, 540 U.S. 44, 50 (2003) (citations omitted).

The first step requires the Court to analyze whether Simonetti has established a prima facie case of unlawful retaliation under the FMLA. "To do so, the plaintiff must show (1) [he] availed herself of a protected right under the FMLA; (2) [he] was adversely affected by an employment decision; and (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." Parker, 234 F. Supp. 2d at 488 (citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 161 (1st Cir. 1998)). The Court finds that there is sufficient evidence upon which Plaintiff could establish a prima facie case. In at least August 2009, and perhaps in other prior instances as well, he clearly availed himself of the medical leave from employment to which the FMLA entitled him. It is undisputed, moreover, that Broadridge made an adverse employment decision with regard to Plaintiff. Finally, the temporal proximity between Broadridge's termination of Simonetti and his FMLA leave – indeed, he was fired on the very same day he was scheduled to resume work following his approved leave – is "unduly suggestive" of a causal connection between the protected leave of absence and the adverse employment action. Id. at 492 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279–80 (3d Cir.2000)). In this case, the timing of the adverse employment decision, together with other facts in the record demonstrating continuing frustration by Simonetti's supervisor with his

absences despite his awareness of Simonetti's health problems, adequately establish the

causation element for purposes of a review of the retaliation claim for triable issues of fact.  See

id. at 492 n.15 (("[D]ischarge on the day of plaintiff's return is enough to suggest causation at this

prima facie stage of the summary judgment motion."); see also Krouse v. Am. Sterilizer Co., 126

F.3d 494, 503 (3d Cir.1997) (holding that causal link may be inferred where timing of adverse

employment action was "unusually suggestive of retaliatory motive"); Jalil v. Avdel Corp., 873

F.2d 701, 709 (3d Cir. 1989) (holding that plaintiff established prima facie case of retaliatory

discharge where causal connection based on evidence of termination days after employer

received notice of plaintiff's EEOC claim).

  Under the McDonnell Douglas analysis, the burden of production now shifts to the

defendant employer to come forward with evidence of a legitimate, non-discriminatory reason for

the plaintiff's termination.  The employer's burden of production at this step in the analysis is a

light one.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994).  "The employer satisfies its burden

of production by introducing evidence which, taken as true, would permit the conclusion that

there was a nondiscriminatory reason for the unfavorable employment decision. The employer

need not prove that the tendered reason actually motivated its behavior, as throughout this

burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests

with the plaintiff."  Id.  Defendants have articulated a legitimate reason for having fired

Simonetti – his documented poor work performance – and have indeed come forward with

evidence in support of Broadridge's decision to terminate Plaintiff on that basis.  Their minimal

burden of production has been met.

Thus, the Court turns back to Plaintiff, who continues to bear the burden of persuasion on

the retaliation claim and must now offer evidence demonstrating that the articulated reason is

pretextual. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 1333, 142-143 (2000).   To

defeat summary judgment, "the plaintiff must point to some evidence, direct or circumstantial,

from which a factfinder could reasonably either (1) disbelieve the employer's articulated

legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than

not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.   To

rebut Defendants' position that Simonetti's termination was based on a record of ongoing

unsatisfactory performance and support his claim that the termination was motivated by his

FMLA-protected absences, Plaintiff points to a number of facts: (1) Peyser complained to

Plaintiff that his work was not getting done while he was out of the office and warned Plaintiff

that his absences were excessive; (2) Peyser and Broadridge's HR department were aware of

Plaintiff's medical conditions, and that many absences, including specifically the December 2008

and January 2009 absences, were related to back problems and high blood pressure, respectively;

(3) the 2009 PIP expressly identified Plaintiff's absences as a factor in his disappointing

performance and an area needing improvement; (4) documented improvements in Plaintiff's job

performance while on the 2009 PIP and successful completion of the 2009 PIP; (5) Peyser's

admission in deposition testimony that in the timeframe immediately preceding the

commencement of Simonetti's August 2009 FMLA leave, Simonetti was meeting the job

requirements of his position; and (6) inconsistent reasons given for Plaintiff's termination (poor

performance leading up to the 2009 PIP versus the client complaint made while Simonetti was on

leave regarding the client's preference for another account manager).   This evidence, viewed

collectively and in the light most favorable to Plaintiff, amply defeats summary judgment.  It demonstrates the kinds of weaknesses and contradictions in Defendants' position that would allow a jury to discredit their proffered legitimate reason.  Clearly, Plaintiff has pointed to Defendants' antagonism concerning his illness-related absences, various positive aspects of his job performance and the timing of the decision to terminate Plaintiff while out on leave, all of which could indicate that Plaintiff's availing himself of his FMLA rights was more likely than not the motivating cause of Broadridge's adverse employment action.  Whether Simonetti's termination was retaliatory or, rather, based on legitimate nondiscriminatory reasons is, in short, a triable issue of fact.  Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.").

Accordingly, Defendants' motion for summary judgment as to the FMLA retaliation claim will be denied.

### D.      NJLAD Disability Claim

The NJLAD prohibits discrimination and unlawful employment practices against individuals on the basis of any present or past disability.  N.J.S.A. 10:5-4.1.  A plaintiff may establish an NJLAD claim by presenting either direct evidence of discrimination or indirect evidence.  Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 300 (3d Cir. 2004).  When the plaintiff relies on indirect evidence, courts apply the McDonnell Douglas three-step burden shifting framework to the claim.  Id.  The parties agree that Plaintiff's NJLAD is subject to the McDonnell Douglas analysis.

Plaintiff must initially establish a prima facie claim of discriminatory termination from employment under the NJLAD for an actual or perceived disability.  To do so, he must prove that (1) he was disabled (or perceived to be disabled); (2) he was objectively qualified for his or her former position; (3) he was terminated; and (4) the employer sought someone to perform the same work after the plaintiff's discharge.  Zive v. Stanley Roberts, Inc., 182 N.J. 436, 450 (2005); Clowes v. Terminix Intern., Inc., 109 N.J. 575, 597 (1988).  Defendants argue that Plaintiff cannot meet this burden because he cannot prove he was disabled within the meaning of the NJLAD at the time of his termination.  The NJLAD, however, defines disability broadly to include any "physical disability [or] infirmity . . . which is caused by bodily injury . . . or illness." N.J.S.A. 10:5-5(q); Viscik v. Fowler Equip. Co., 173 N.J. 1, 15-16 (2002).  In this jurisdiction, courts have expressly recognized back injury as falling within the statute's purview.  Failla v. City of Passaic, 146 F.3d 149, 153–54 (3d Cir.1998).  Indeed, Defendants do not dispute that there is evidence that Plaintiff suffered from chronic back pain as a result of a 1996 slip-and-fall injury and was in fact out on disability leave for approximately three months prior to his termination due to re-injury he sustained in early August of 2009.  Instead, they maintain that Plaintiff's clearance from his physician to return to work without restriction negates his claims of disability and precludes his NJLAD disability discrimination claim.  While Defendants cite two District of New Jersey cases which held that such unrestricted clearance rendered the NJLAD claim without merit as a matter of law, those cases reasoned that summary judgment was warranted because the plaintiffs could not provide any competent evidence demonstrating that they were disabled or perceived by the employer to be disabled.  See Ellison v. B.J.'s, Inc., 2007 WL 3395831, at *5-6 (D.N.J. Nov. 8, 2007); Oare v. Midatlantic Nat'l Bank/Merchs., 1990 WL

18

4622, at *1 (D.N.J. Jan. 16, 1990).  In contrast, in this case, Plaintiff has a documented chronic

back problem.  Indeed, the record is clear that at the time of his August 2009 leave, in fact

diagnosed with "multilevel degenerative disc disease"and herniated and bulging discs by his

treating physician based on examination and MRI.  The cases cited by Defendants are factually

distinct from the case at bar, and their reasoning does not apply.  There is ample evidence in the

record that would allow the Plaintiff to prove that he was disabled within the meaning of the

NJLAD by virtue of his ongoing back injury.

Defendants further argue that even if Plaintiff can establish a prima facie case, they have

articulated a legitimate reason for discharging him – his "documented and continuing poor

performance."  (Def. Br. at 26.)  The record, Defendants contend, lacks competent evidence that

such a reason was pretextual.  For reasons the Court has already discussed, Plaintiff has in fact

raised a triable issue of fact as to the reason for his termination.  In the context of his NJLAD

disability discrimination claim, Plaintiff has adduced proof that his chronic back problem was

"more likely than not a determinative factor in the decision" to terminate him.  Bowles v. City of

Camden, 993 F. Supp. 255, 262 (D.N.J. 1998).  The Court takes note of the evidence that, from

Defendants' perspective, Simonetti's excessive absences interfered with his ability to accomplish

his work successfully and meet the expectations of his supervisor, Peyser.  There is also evidence

that Peyser was aware that at least some of these absences were due to Simonetti's back

condition.  Plaintiff can demonstrate that many of the performance deficiencies cited by

Defendants as non-discriminatory bases for terminating his employment in fact stem from the

disability-related limitations he faced in coming to work and doing his job and are thus pretext

for discrimination against Simonetti for his physical disability.  In short, for purposes of

19

summary judgment, Defendants' effort to separate their proffered legitimate reason for termination from the chronic back pain they acknowledge plagued Plaintiff for years does not carry their burden. The genuine issue of fact as to the motivating factor resulting in Plaintiff's termination allows his NJLAD claim to survive this summary judgment motion.

The Court adds that the NJLAD claim survives as to both the employer Defendant, Broadridge, and individual Defendant Peyser. Although Defendants have correctly stated that there is no direct individual liability under the NJLAD, the statute does recognize that individuals may be liable under a theory of aiding and abetting. N.J.S.A. 10:5-12(e); Cichetti v. Morris County Sheriff's Office, 194 N.J. 563, 591 (2008). The New Jersey Supreme Court has held to establish NJLAD aiding and abetting liability against an employee, a plaintiff must show that "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.' " Tarr v. Ciasulli, 181 N.J. 70, 84 (2004). As to Defendant Peyser, Plaintiff has presented more than sufficient evidence to allow the question of aiding and abetting liability to proceed to a jury trial. Peyser was Simonetti's supervisor at Broadridge and actively involved in creating negative repercussions for Simonetti for what Peyser perceived to be excessive absences, related inattention to workload and overall deficient performance. Peyser, the record shows, chastised Simonetti for being out of the office because his work would pile up and warned that continued absences could lead to his termination, yet he has admitted in his deposition testimony that he knew that Peyser suffered from debilitating back problems as a result of his slip-and-fall injury which often prevented him from coming to work. Peyser

20

prepared the negative performance reviews for 2007 and 2008, placed Simonetti on a PIP immediately after two prolonged medically related absences and made in the decision to terminate Simonetti while he was out on approved disability leave for his back condition. The courts have recognized that even willful indifference or failure to act could expose a supervisor to NJLAD liability. See, e.g., Ivan v. County of Middlesex, 612 F. Supp. 2d 546, 553-54 (D.N.J. 2009) Here, the evidence in the record before the Court goes well beyond inaction. The direct evidence of Peyser's express and overt hostility towards Plaintiff's time out of the office together with his knowledge of Plaintiff's medical condition, and the reasonable inferences that may be drawn from such evidence, certainly suffice to constitute "active and purposeful conduct" by Peyser to discriminate against Simonetti based on his physical disability. Cichetti, 194 N.J. at 595 (holding that "active and purposeful conduct . . . is required to constitute aiding and abetting" under NJLAD).

The Court concludes that the evidence proffered by Plaintiff defeats the motion for summary judgment as to both Defendants on the NJLAD claim.

### E.     Damages

As a final point, the Court takes note of Defendants' argument that, to the extent the Complaint seeks punitive and/or non-economic damages under the FMLA, those damages claims must be stricken because it is well-established that such damages are not recoverable under the FMLA. See 29 U.S.C. § 2617(a) (damages provision of FMLA providing that employee plaintiff may recover damages for lost wages and other compensation as well as appropriate equitable relief such as reinstatement); Santosuosso v. NovaCare Rehabilitation, 462 F. Supp. 2d 590, 600-

01 (D.N.J. 2006); Zawadowicz v. CVS Corp., 99 F. Supp. 2d 518, 540 (D.N.J. 2000).  Plaintiffs

acknowledge that Defendants are correct in their statement of the law but clarify that they seek

punitive and emotional distress damages only for the alleged NJLAD violation.  Indeed, the

Complaint pleads non-economic harm, such as "emotional pain and suffering" and "humiliation"

only as a result of the alleged disability discrimination, not as a result of the alleged FMLA

interference or retaliation.  Compare Complaint ¶¶  37 and 40 with ¶ 47 (erroneously listed as ¶

41).  As the NJLAD claim survives, so do Plaintiff's demands for non-economic and punitive

damages, which may be recovered under the NJLAD.  N.J.S.A. 10:5-3; Levinson v. Prentice-

Hall, Inc., 868 F.2d 558, 561 (3d Cir. 1989); Delli Santi v. CNA Cos., 88 F.3d 192, 205 (D.N.J.

2006).

III.    CONCLUSION

         For the foregoing reasons, the Court will deny Defendants' summary judgment motion in

its entirety.  An appropriate form of order will be filed together with this Opinion.


                                 s/Stanley R. Chesler
                           STANLEY R. CHESLER
                           United States District Judge


DATED: January 5, 2012